IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

**IN RE JAXEN F.**

**Appeal from the Chancery Court for Sullivan County**
**No. 23-CK-43816   Katherine Leigh Priester, Chancellor**

_____

**No. E2025-00018-COA-R3-PT**

_____

This is a termination of parental rights appeal. The trial court found that four statutory grounds existed to terminate Mother's parental rights to the minor child: abandonment by failure to visit, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to assume custody. The trial court further concluded that termination was in the child's best interests. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

VALERIE L. SMITH, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Ryan T. Logue, Morristown, Tennessee, for the appellant, Katelyn F.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

### I.   BACKGROUND & PROCEDURAL HISTORY

Jaxen F. ("the Child") was born in December of 2011 to Stetson L. ("Father") and Katelyn F. ("Mother").[1] The Tennessee Department of Children's Services ("DCS") has been involved with the Child for most of his life. DCS first received a referral concerning the Child in early 2015 when he was three years old. At that time, DCS found that Mother struggled with drug addiction and lived in an environment that was not safe for

_____

[1] Father did not participate in the trial or appellate court proceedings. Therefore, the facts contained in this Opinion relate only to Mother's conduct.

the Child. Specifically, the referral alleged that Mother was using marijuana, buprenorphine, and methamphetamine, that she was neglecting the Child by not feeding him, and that she used the Child's urine to fake her drug screens.

In July of 2015, the Sullivan County Juvenile Court adjudicated the Child dependent and neglected due to Mother's drug use. Following that adjudication, the Child was placed in a non-foster custodial arrangement with Jacqueline and Timothy J. pursuant to an emergency protective custody order. The Child remained in their care for several years. However, in February of 2019, Jacqueline and Timothy J. requested to "relinquish custody of [the Child] due to conflicts with Mother." In response, the juvenile court issued another emergency protective custody order in February 2019, which transferred physical and legal custody to the State of Tennessee. The Child has remained in foster care since that time.

Following the Child's entry into state custody, DCS attempted to assist Mother to remedy the conditions that led to the Child's removal. DCS developed the first permanency plan in February of 2019. This plan required Mother to: (1) obtain and maintain safe, stable housing; (2) obtain and maintain a legal source of income; (3) submit to random drug screens and remain drug-free; (4) complete an alcohol and drug assessment and follow all treatment recommendations; (5) participate in individual counseling; (6) pay $20 per month in child support; (7) participate in family therapy with the Child; (8) complete a parenting assessment and follow recommendations; and (9) maintain regular visitation with the Child. Mother signed the initial plan in February of 2019 and was provided with copies of her responsibilities as well as notices of the consequences of noncompliance with the permanency plan. The juvenile court ratified the initial permanency plan on March 20, 2019, finding that Mother's requirements were reasonably related to remedying the reasons for foster care. However, while Mother occasionally participated in therapeutic services and intermittently visited with the Child, she continued to struggle with substance abuse, housing instability, and mental health challenges.

The record indicates that nine iterations of the permanency plan were developed, each of which contained the same substantive requirements in the initial plan. The permanency plan was revised in July of 2019, December of 2019, March of 2020, August of 2020, January of 2021, June of 2021, December of 2021, and January of 2022. The juvenile court ratified each of these revised permanency plans after finding that the revisions were in the Child's best interests and that the requirements for Mother were reasonably related to remedying the conditions necessitating the Child's placement into foster care. Following the initial plan, the subsequent plans required Mother to complete a parenting assessment, retain a signed lease agreement, and participate in individual therapy.

On April 13, 2023, DCS filed a petition in the trial court seeking to terminate

Mother's and Father's parental rights to the Child. The petition alleged four statutory grounds for termination as to Mother: (1) abandonment by failure to visit pursuant to Tennessee Code Annotated section 36-1-113(g)(1); (2) substantial noncompliance with the permanency plan pursuant to section 36-1-113(g)(2); (3) persistent conditions pursuant to section 36-1-113(g)(3); and (4) failure to manifest an ability and willingness to assume custody pursuant to section 36-1-113(g)(14). The petition further alleged that termination was in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(c)(2).

Mother did not have stable housing beginning in at least 2019. At trial, Mother testified that she was residing with a family friend, "Mr. Brixey", who allowed her to live in the upstairs portion of his split-level Kingsport residence without a lease agreement or payment of rent. Mother stated that she relied on Mr. Brixey and family for essentials such as food and transportation. Mother completed housework around the residence in lieu of a rental payment. Mother's caseworker testified that if Mother obtained a lease from Mr. Brixey that would ameliorate the unstable housing issue. The record indicates that a lease agreement between Mother and Mr. Brixey was never provided. Mother was not employed but testified that she was pursuing disability benefits and receiving SNAP assistance. Despite a lack of employment, Mother continued to pay $20 per month in child support as required by each iteration of the permanency plan.

Mother's drug use was a recurring topic of discussion throughout this proceeding. She continued to test positive for controlled substances—including THC. The trial court highlighted Mother's history of using THC and buprenorphine, the latter of which she allegedly obtained from a North Carolina clinic without providing documentation during the trial court proceedings. The trial court noted that the circumstances surrounding how Mother obtains "her medication out of North Carolina seemed suspect based upon her testimony and demeanor during her testimony." Mother initially testified that she also had a prescription for THC but that she did not need a prescription because she just bought it from the store. Mother refused a drug screen a few days before trial and tested positive for THC on April 3, 2023. Mother testified that she uses Delta 8 to help her sleep and combat seizures. Although requested by DCS, Mother never completed a hair follicle test, which would have provided more detailed results such as distinguishing between THC and Delta 8. Mother's caseworker, who received the case in December of 2023, testified that, despite requesting that Mother submit to the screening on multiple occasions, a drug screen was not obtained.

Regarding Mother's visitation with the Child during the relevant four-month period preceding the petition's filing on April 13, 2023, Mother visited the Child only once—on January 23, 2023. Mother testified that she ceased visitation due to the Child's discomfort at the DCS office and alleged that the Child was being coached. Mother requested an alternative visitation location, which DCS denied. Mother's caseworker testified that in other cases DCS would accommodate a parent's request for a location

other than DCS if it was appropriate. While the caseworker did not state that accommodating Mother's request here was inappropriate, the caseworker emphasized that the Child desired for visitation to continue at the DCS office. DCS presented communications showing that Mother refused to participate in visits unless the location was changed. The trial court ultimately found Mother's testimony on this point not credible and determined that Mother was aware of the consequences of failing to visit but chose to visit on her own terms.

The Child has lived continuously in the same foster home since 2019, and the trial court emphasized that the Child has developed a bond with the foster parent. He was thirteen years old and had not lived with his biological mother in more than nine years. Mother's caseworker testified that the Child does not wish to continue visitation with Mother. The trial court noted that DCS attempted to assist Mother with retaining housing, scheduling visitations, transportation, and setting up individual therapy. However, Mother's caseworker testified that Mother declined each of these services from DCS. Mother's DCS caseworker testified that getting in contact with Mother was difficult and she did not respond to multiple communications.

A trial was held on September 9, 2024. Ultimately, the trial court concluded that DCS had proven by clear and convincing evidence the four alleged statutory grounds for termination: abandonment by failure to visit, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. It further concluded that termination of Mother's parental rights was in the best interest of the Child. Mother timely filed a Notice of Appeal in this Court on January 2, 2025.

## II.    ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1. Whether the trial court erred by finding clear and convincing evidence that Mother willfully and voluntarily abandoned the Child by willfully and voluntarily failing to visit the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(1).

2. Whether the trial court erred by finding that Mother was in substantial noncompliance with the court approved permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

3. Whether the trial court erred by finding clear and convincing evidence that conditions persist that prevent Mother from assuming legal and physical custody of the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

- 4 -

4. Whether the trial court erred by finding clear and convincing evidence that Mother failed to manifest an ability and willingness to assume legal and physical custody of the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

5. Whether the trial court erred by finding clear and convincing evidence that it is in the Child's best interests to terminate Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(i)(1).

## III. LAW AND ANALYSIS

"Parents have a fundamental constitutional interest in the care and custody of their children," which is guaranteed under both the United States and Tennessee constitutions. *In re Connor B.*, 603 S.W.3d 733, 788 (Tenn. Ct. App. 2020) (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2022)). This right is not absolute, however, and may be terminated if a court finds that one of the statutory grounds for termination exists and that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Statutory grounds for termination and a determination that termination is in the child's best interest must all be found by clear and convincing evidence, which "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts . . . and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted).

In cases involving the termination of parental rights, the standard of appellate review differs slightly from general appellate review under Rule 13 of the Tennessee Rules of Appellate Procedure. The Tennessee Supreme Court has explained this heightened form of review as follows:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d

835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at \*7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at \*7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See Bernard T.*, 319 S.W.3d at 596. Because of the nature of the consequences, proceedings to terminate parental rights require an individualized determination. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## IV. GROUNDS FOR TERMINATION

1. <u>Abandonment – Failure to Visit</u>

Mother argues on appeal that the trial court erred by finding clear and convincing evidence that Mother abandoned the Child by willfully failing to visit. Specifically, Mother contends that her failure to visit the Child was not willful. DCS asserts that Mother made no attempt to see the Child, despite being aware of her responsibilities. DCS further asserts that the one visitation held during the relevant four-month window amounts to token visitation only. The trial court found that Mother had willfully failed to visit the Child in the four months preceding the termination petition. The trial court further found that Mother was "not cooperative and would often express disapproval of exercising visits at the DCS office even though it was the Child's express wishes that the visits occur at DCS."

Parental rights may be terminated for abandonment. Tenn. Code Ann. § 36-1-113(g)(1). Relevant to this case, the term "abandonment" includes:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to

terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

*Id.* § 36-1-102(1)(A)(i). The statute further provides that "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." *Id.* § 36-1-102(1)(A)(I). A parent may assert the absence of willfulness, which must be proven by a preponderance of the evidence. *Id.*

Willfulness requires the capacity to visit, and the choice not to do so, without a justifiable excuse. *Audrey S.*, 182 S.W.3d at 864 (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (2004)). Willfulness does not require malice or ill intent; rather, it exists when a parent is aware of the duty to visit and has the ability to do so but chooses not to. *Id.* at 864-65. Further, "[w]hen analyzing willfulness, courts have considered whether a parent who was allegedly denied visitation redirected their efforts to the courts in an attempt to secure visitation." *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *5 (Tenn. Ct. App. Dec. 22, 2016).

A "[f]ailure to visit is not willful if another person's conduct prevents the parent from visiting or 'amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child.'" *In re Mattie L.*, 618 S.W.3d 335, 350–51 (Tenn. 2021) (quoting *In re Audrey S.*, 182 S.W.3d at 863). Thwarting a parent's access to a child may include "'(1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child.'" *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) (quoting *In re S.M.*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004)).

DCS concedes on appeal that Mother visited the Child once during the four-month period before the petition was filed; however, it asserts that this action amounts to merely token visitation. A parent has "failed to visit" if he or she has failed "for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "[T]oken visitation" means visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). "[T]his Court has never imposed a bright-line rule as to what percentage of visitation must be attended in order [to] avoid categorization as token." *In re Addalyne S.*, 556 S.W.3d 774, 785 (Tenn. Ct. App. 2018); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020) (holding that two visits were of such an infrequent

nature as to merely establish minimal or insubstantial contact); *see, e.g.*, *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *6 (Tenn. Ct. App. Apr. 23, 2020) (holding that three supervised visits and two other contacts were token visitation); *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *4 (Tenn. Ct. App. July 13, 2017) (concluding that a parent who used only two hours of the sixteen allowed engaged in token visitation).

The relevant four-month period for Mother's visitation with the Child in this case was December 13, 2022, through April 12, 2023. Mother visited the Child once during this four-month period on January 23, 2023. Mother's caseworker testified that the agency attempted to facilitate visitation, but that Mother objected to holding visitation at DCS's office. The trial court specifically found that Mother "was only willing to visit under her terms and conditions" rather than cooperate with DCS's policies and the Child's expressed wishes regarding the visitation setting. The trial court further found that "Mother was not cooperative and would often express her disapproval of exercising visits at the DCS office even though it was the [C]hild's express wishes that the visits occur at DCS." Although it did not address whether Mother's visitation was "token" as defined by Tennessee Code Annotated section 36-1-102(1)(C), the trial court emphasized that "DCS attempted to work with Mother to schedule visits that were compliant with their internal policies, court orders and the [C]hild's expressed wishes." The trial court determined that Mother's testimony that DCS did not offer any visits was not credible.

We further note that Mother did not raise lack of willfulness as an affirmative defense in her answer to the initial petition seeking termination of her parental rights. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."). As such, she arguably waived the absence of willfulness as a defense to the ground of abandonment by failure to visit. *See* Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Leah T.*, M2022-00839-COA-R3-PT, 2023 WL 4131460, at *7 (Tenn. Ct. App. June 22, 2023) (finding the defense of willfulness to be tried by implied consent when the trial court analyzed the issue based on extensive testimony by the parties). However, this Court has previously held that where the petitioners failed to object to evidence presented at trial concerning the parent's alleged lack of willfulness relative to the ground of abandonment through failure to visit, the defense was deemed to have been tried by implied consent. *See In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *8 (Tenn. Ct. App. Nov. 10, 2021); *see also McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) ("Implied consent hinges on the issues that were actually litigated by the parties[.]").

For these reasons, the trial court determined Mother was aware of the consequences of her failure to visit the Child. Mother averred that DCS did not offer or accommodate visitation at Mother's request, but the trial court did not find this testimony credible. While "the extent of DCS's efforts to reunify the family is weighed in the

- 8 -

court's best-interest analysis, but proof of reasonable efforts is not a precondition" to termination of parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Discerning no error, we affirm the trial court's finding that clear and convincing evidence supported that Mother abandoned the Child by willfully failing to visit as set forth in Tennessee Code Annotated section 36-1-113(g)(1).

### 2. Substantial Noncompliance with Permanency Plan

Mother argues next that the trial court erred in finding that she was in substantial noncompliance with the permanency plans. She asserts that she made progress toward the goals of her permanency plan by retaining suitable housing and reliable transportation. DCS contends that Mother continues to struggle with instability, including substance abuse, lack of reliable housing, and noncompliance with the permanency plan's essential requirements. The trial court found that while Mother completed some of the requirements in the plans, Mother failed to substantially comply with the goals of the plans. The court further noted that, despite the passage of time and several extensions and versions of permanency plans, Mother had not made lasting changes that would provide a safe and stable environment for the Child.

Courts may terminate a parent's rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground cannot be established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656

(citations omitted).

Here, the initial permanency plan was signed by Mother on February 19, 2019. The permanency plans were then revised in July of 2019, December of 2019, March of 2020, August of 2020, January of 2021, June of 2021, December of 2021 and January of 2022. When ratifying each of the permanency plans, the juvenile court found that the requirements were in the Child's best interests and reasonably related to remedying the reasons for foster care. The plans required that Mother: (1) obtain and maintain safe, stable housing; (2) obtain and maintain a legal source of income; (3) submit to random drug screens and remain drug-free; (4) complete an alcohol and drug assessment and follow all treatment recommendations; (5) participate in individual counseling; (6) pay $20 per month in Child support; (7) participate in family therapy with the Child; (8) complete a parenting assessment and follow recommendations; and (9) maintain regular visitation with the Child.

The trial court found that Mother failed to substantially comply with the essential requirements of the permanency plan, including the goal of obtaining and maintaining safe and stable housing. At trial, the court noted that Mother currently resided with a family friend named Mr. Brixey, who provided groceries and transportation in exchange for housework. However, Mother admitted she knew very little about him and testified that they lived on separate levels of the residence. The court found this arrangement unsuitable for reunification and specifically concluded that Mother's testimony regarding her housing situation lacked credibility. The trial court determined that her failure to secure stable and appropriate housing remained a significant barrier to the Child's safe return.

As to the requirement that Mother obtain and maintain a legal source of income, the trial court found she does not have reliable employment. Mother failed to produce documentation of stable work or sufficient income to support herself, let alone the Child. While Mother testified that she is in the process of obtaining disability payments, there was no evidence regarding when those payments would begin or if Mother was even qualified to receive such assistance. The trial court concluded that this lack of financial stability undermined her ability to provide for the Child's basic needs.

Regarding the plan's requirement that Mother submit to and pass random drug screens and address substance abuse, the trial court found that Mother continued to test positive for THC. Mother conceded during trial that she had no intention of discontinuing THC. Although she claimed to be prescribed buprenorphine from a North Carolina clinic, Mother failed to provide documentation of the prescription. The trial court further found that Mother did not complete a current alcohol and drug assessment, despite repeated requests, and that the only assessments she did complete were in 2017 and 2019—before the Child entered DCS custody. She did not provide documentation of these prior assessments to her caseworker until the day of trial.

The trial court also found that Mother failed to consistently participate in individual counseling, as required by the permanency plan. Mother's attendance became so infrequent that her case was at risk of closure for noncompliance. The trial court found that this inconsistency reflected Mother's continued failure to address her underlying mental health and behavioral concerns, which was necessary for reunification.

Finally, the trial court found that Mother failed to participate in regular visitation with the Child, which was required under each iteration of the permanency plan. Mother visited the Child once during the four months preceding the filing of the termination petition, and the record indicates that Mother made no efforts to maintain contact thereafter. The trial court concluded that this lack of visitation reflected an overall unwillingness to engage in the parent-child relationship in a meaningful or consistent way.

Although Mother testified that she completed a parenting assessment, she was unable to provide a completion date, and the court was not persuaded that this effort outweighed her broader noncompliance. Mother's noncompliance was substantial because she failed to comply with the core components of the permanency plan and failed to make lasting changes that would permit a safe reunification.

We conclude that the trial court did not err in finding there was clear and convincing evidence that Mother's noncompliance with the permanency plans was substantial as set forth in Tennessee Code Annotated section 36-1-113(g)(2).

3. Persistent Conditions

Mother next argues on appeal that the trial court erred in terminating her parental rights based on the ground of persistent conditions, asserting that she had made meaningful progress toward remedying the issues that led to the Child's removal. Mother concedes that at least six months have passed since the Child was removed from her care. However, Mother contends that DCS failed to prove by clear and convincing evidence that the conditions which led to removal persist because Mother completed 60 hours of alcohol and drug assessment treatment and developed a plan for the Child to be able to live with Mother. DCS asserts that despite creating nine permanency plans, Mother failed to establish a safe and stable environment for the Child and remained unable to assume custody or provide appropriate care. The trial court found that the conditions which led to the Child's removal continued to persist and that there was little likelihood those conditions would be remedied in the near future. In support of this finding, the court cited Mother's ongoing instability, including her lack of suitable housing and limited engagement in services offered by DCS.

Courts may terminate a parent's rights for persistent conditions when:

(A) The Child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a Child is a dependent and neglected Child, and:

    (i)    The conditions that led to the Child's removal still persist, preventing the Child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the Child to be subjected to further abuse or neglect, preventing the Child's safe return to the care of the parent or guardian;

    (ii)    There is little likelihood that these conditions will be remedied at an early date so that the Child can be safely returned to the parent or guardian in the near future; and

    (iii)    The continuation of the parent or guardian and Child relationship greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

*Id.* § 36-1-113(g)(3). A court must determine that each of these three factors existed and that the Child had been removed from the home by court order for six months in order to terminate parental rights based on this ground. *Audrey S.*, 182 S.W.3d at 873-74.

This ground focuses on the outcome of the parents' efforts at improvement, rather than the fact that the parents made the efforts. *Id.* at 874. The purpose of the persistent conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (internal citations omitted). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

Mother asserts that she has taken steps to address her substance abuse by completing 60 hours of an alcohol and drug assessment treatment. Furthermore, Mother testified that she and Mr. Brixey have a plan for the Child to be able to live at the

residence should she be granted custody. Mother testified that, in the alternative, she and the Child could reside with her mother. Mother's argument is unavailing. These assertions represent the totality of Mother's argument on this issue, and she gives no further reasoning as to how the trial court erred in finding that DCS proved the ground of persistent conditions.

The trial court found that the conditions underpinning the Child's removal from Mother's custody persisted at the time of the hearing with little likelihood that the conditions would be remedied so that the Child can safely return to Mother in the near future. The Child was removed from Mother's custody in 2015 after the Child was found dependent and neglected due to Mother's drug use and neglect in feeding the Child. Specifically, Mother was alleged to be "using marijuana, buprenorphine and methamphetamines that she was smoking, snorting and injecting." The trial court concluded that this condition persisted and there was "little likelihood that these conditions will be remedied at an early date so that the child can safely return to the parent or guardian in the near future." To reach this conclusion, the trial court relied on Mother's testimony that she currently has a prescription for buprenorphine and reportedly travels to North Carolina for medication. The trial court noted that the circumstances surrounding how Mother obtains "her medication out of North Carolina seemed suspect based upon her testimony and demeanor . . . ." Included in this testimony is Mother's concession that she was not willing to stop using THC. The trial court noted that approximately nine years had passed since the Child's removal, and Mother made limited progress in that time. The trial court further concluded that continuation of the parent-child relationship "greatly diminishes the Child's chances of being placed into a safe, stable and permanent home."

We discern no error in the trial court's conclusion that clear and convincing evidence supports termination of Mother's parental rights based on this ground.

4. <u>Failure to Assume Legal and Physical Custody or Financial Responsibility</u>

The trial court also held that DCS had proven that Mother had failed to manifest the willingness or ability to parent the Child. Parental rights may be terminated when:

> A parent has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child and placing the Child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child . . . .

*Id.* § 36-1-113(g)(14). This ground contains two elements that must both be proven by clear and convincing evidence. The first element "places a conjunctive obligation . . . on a parent to manifest both an ability and willingness to personally assume legal and

- 13 -

physical custody or financial responsibility for the Child." *In re Neveah M.*, 614 S.W.3d 659, 677 (2020). The second prong of the examination requires a risk of substantial harm which is defined as, "a real hazard or danger that is not minor, trivial, or insignificant . . . [and] . . . the harm must be more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). "While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.*

On appeal, Mother asserts that the trial court's application of the two-prong test erroneously determined there is clear and convincing evidence that Mother has failed to manifest an ability to assume legal and physical custody of the Child. Mother reasons that her completion of 60 hours of drug and alcohol assessment treatment, initiating disability payments, paying child support, and obtaining housing with Mr. Brixey is an expression of willingness to assume legal and physical custody of the Child. We disagree. This ground is satisfied if a petitioner proves by clear and convincing evidence that a parent "has failed to manifest <u>either</u> ability or willingness." *Neveah M.*, 614 S.W.3d at 677 (emphasis in original) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)); *see also Bernard T.*, 319 S.W.3d at 604 (terminating parental rights even though the father manifested a willingness to assume legal custody but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence").

Mother's assertions of willingness and desire to parent the Child are not sufficient alone, as this Court "look[s] for more than mere words" when making this determination. *In re Jonathan M.*, No E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Mother's willingness to parent could have been demonstrated "by attempting to overcome the obstacles that prevent [her] from assuming custody or financial responsibility for the [C]hild." *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). Mother has failed to make any compelling argument that the trial court's findings should be reversed on this ground.

To support her argument that the trial court did not properly apply the standard in Tennessee Code Annotated section 36-1-113(g)(14), Mother asserts that her behavior and actions do not show that harm is sufficiently probable "to prompt a reasonable person to believe that the harm will occur more likely than not." *See Ray*, 83 S.W.3d at 732. However, the trial court specifically found that:

> Respondent/Mother has failed to secure stable housing, is still testing positive on drug screens, does not have any reliable employment and is not gainfully employed, and has no reliable transportation. Placing the [C]hild in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild. The [C]hild

- 14 -

has not resided in the Respondent/Mother's home in over nine years and as previously found by the court the Respondent/Mother has not remedied the conditions that has caused the removal in the first place.

In light of the foregoing, the trial court found that removing the Child from his current home and placing him back in Mother's custody would expose him to a substantial risk that Mother will fail to obtain employment or suitable housing or expose the Child to drug use. The record on appeal supports the trial court's conclusion that DCS proved by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the Child and returning him in Mother's care would pose a risk of substantial harm to his physical or psychological welfare.

## V.     BEST INTEREST OF THE CHILD

Mother contends that termination of her parental rights is not in the Child's best interest. However, Mother's brief does not contain a clear, substantive argument regarding the Child's best interest and repeatedly states that she "disagrees" with the trial court's conclusions on various best interest factors without elaboration. DCS argued that Mother had not demonstrated continuity and stability in meeting the Child's basic needs and had not demonstrated a lasting adjustment of circumstances to make it safe for the Child to return to Mother. The trial court concluded that termination of Mother's parental rights was in the best interest of the Child reasoning that Mother had not remedied the issues preventing reunification. Our analysis is as follows.

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and Child diverge, and the focus shifts to what is in the Child's best interest. *Audrey S.*, 182 S.W.3d at 877; *see also Carrington*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider. The factors may include, but are not limited to:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." *Id.* § 36-1-113(i)(3).

The list of factors is not exhaustive, and the statute does not require the trial court to find the existence of every factor before concluding that termination is in the best interest of the child. *See Carrington H.*, 483 S.W.3d at 523; *Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). The best interest of a child must be determined from the child's perspective rather than the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute further provides that "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

In this case, the trial court found the following factors applicable: Tennessee Code Annotated sections 36-1-113(i)(A), (B), (C), (D), (E), (H), (I), (J), (K), (L), (M), (O), (P), (Q), (R), (S), and (T). We begin by examining the factors relevant to the Child's emotional needs. *See id.* §§ 36-1-113(i)(A), (B), (D), (E), (H), and (I). The trial court addressed the importance of permanence and stability noting that the Child "has a critical

need for stability and continuity of placement throughout the remainder of his minority." The record before the trial court demonstrated that the Child has been in his current placement for over five years and has developed a bond with the foster parent. The trial court included the finding that "any change in the [C]hild's caregiver at this stage would have an extremely negative effect on the [C]hild's emotional, psychological and medical conditions." The record indicated that Mother had not developed a healthy and secure parental relationship with the Child in order to provide the Child with the appropriate structure that children need. The Child's visitations with Mother were "very disruptive for the [C]hild and would cause significant behavioral issues for the [C]hild at school." Further, the Child's foster parent has been consistently and actively participating in the Child's life. The trial court emphasized that the Child has developed a healthy and strong attachment to the foster parent and the foster parent's immediate and extended family.

We next consider the factors related to whether Mother can meet the Child's needs. *See id.* §§ 36-1-113(i)(C), (J), (K), (L), (M), (O), (P), (Q), (R), (S), and (T). The trial court found that "Mother continues to have issues securing stable and safe housing, remaining drug free, dealing with unaddressed mental health issues and dealing with significant health issues." According to the testimony presented at trial, Mother "failed to demonstrate a lasting adjustment of circumstances, conduct or condition that would make it safe and beneficial for the [C]hild." Mother has not participated in the Child's medical or educational appointments and, as the trial court found, has not demonstrated an understanding of the basic and specific needs required for the Child to thrive. Additionally, the record demonstrated that Mother failed to take advantage of services offered through DCS to assist her with housing, drug and alcohol treatment, individual counseling and supervised visitation. The trial court emphasized that Mother's physical and mental health conditions render it unsafe for the Child to return to Mother. The trial court concluded that Mother has "exhibited a continuity or stability in meeting the [C]hild's basic material, educational, housing or safety needs."

After considering the relevant statutory factors and assessing their weight, the trial court determined that DCS had proven by clear and convincing evidence that it was in the best interest of the Child for Mother's parental rights to be terminated. Upon our own review of the record, we conclude that the trial court properly weighed the relevant factors and found clear and convincing evidence that termination is in the Child's best interest. *See Carrington H.*, 483 S.W.3d at 535.

## VI.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to Appellant, Katelyn F., for which execution may issue if necessary.

s/Valerie L. Smith
VALERIE L. SMITH, JUDGE